# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APHAYAVONG CHANSAMONE,<br><br>                                   Plaintiff,<br>  vs.<br><br>A. MALFI, Warden,<br><br>                                  Defendant. | CASE NO. 06cv2552-IEG (WMc)<br><br>REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: PETITION FOR WRIT OF HABEAS CORPUS |

**I. INTRODUCTION**

        Chansamone Aphayavong ("Petitioner"), a state prisoner proceeding *pro se*, brings this Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. section 2254 ("Petition") challenging his San Diego Superior Court conviction in case number SDC161852.  Petitioner claims: (1) insufficient evidence supports his conviction for second degree murder (Petition at 6, Traverse at 8.); (2) he received ineffective assistance of counsel (Petition at 7, Traverse at 10.); and (3) the trial court erred in failing to instruct the jury regarding lesser included and related offenses (Petition at 8, Traverse at 11-12.).  After reviewing the Petition, Respondent's Memorandum of Points and Authorities in Support of Answer to Petition for Habeas Corpus ("Answer"), and all supporting documents submitted by the parties, **IT IS RECOMMENDED** that the Petition be **DENIED** for the reasons set forth below.

## II. PROCEDURAL HISTORY

On June 10, 2002, the San Diego County District Attorney's Office filed an Information against Petitioner in San Diego County Superior Court, charging Petitioner with a single count of murder. (Lodgment No. 2 at 3-5.) The Information included two enhancements. (*Id*.) The first enhancement, pursuant to California Penal Code section 186.22(b)(1), was based on Petitioner's association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members. (Lodgment No. 2 at 4.) The second enhancement, pursuant to California Penal Code sections 667(b) through (i), 1107.12, and 668, was based on Petitioner's prior convictions of serious or violent felonies in San Diego Juvenile Superior Court and San Diego Superior Court.[1] (Lodgment No. 2 at 5.) On July 30, 2002, a jury convicted Petitioner of second degree murder (Count 1). (Lodgment No. 2 at 296.) On December 12, 2002, the trial court sentenced Petitioner to 45 years to life in state prison, consisting of 30 years to life for murder enhanced by a consecutive 10-year term for his criminal street gang enhancement, plus five years for a prior serious felony conviction. (Lodgment No. 2 at 414; Lodgment No. 6 at 9-10.)

On December 16, 2002, Petitioner filed a Notice of Appeal (Lodgment No. 2 at 401.) and on or about January 14, 2004, served his Opening Brief to the California Court of Appeal, Fourth Appellate District, Division One. (Lodgment No. 3.) Petitioner appealed his conviction on the grounds: (1) the trial court prejudicially erred by not instructing the jury, *sua sponte*, on the lesser included offense of voluntary manslaughter based upon unreasonable self defense; (2) Petitioner's attorney rendered ineffective assistance by failing to request instruction on voluntary manslaughter and assault; (3) there was insufficient evidence to support Petitioner's conviction for second degree murder; and (4) the trial court erred in imposing a ten-year consecutive criminal street gang enhancement under California Penal Code section 186.22(b)(1)(c), rather than the alternate criminal street gang penalty of a 15-year minimum parole eligibility term under Penal Code section 186.22(b)(5). (Lodgment No. 3.) On February 15, 2005, the state appellate court affirmed the conviction in an unpublished opinion but reversed the ten-year consecutive criminal street

---

[1] On June 6, 1995, Petitioner pled guilty to two counts of assault with a semi-automatic firearm and was sentenced to three (3) years in prison. (Lodgment No. 2 at 72-73)

1 gang enhancement. (Lodgment No. 6.)

2 On March 23, 2005, Petitioner filed a Petition for Review in the Supreme Court of
3 California. Petitioner raised the sole issue of insufficient evidence to support his conviction for
4 second degree murder. (Lodgment No. 7.) The California Supreme Court denied Petitioner's
5 Petition for Review without explanation on June 8, 2005. (Lodgment No. 8.)

6 Petitioner then filed a Petition for Writ of Habeas Corpus with the California Court of
7 Appeal, Fourth Appellate District, Division One, on May 2, 2005. (Lodgment No. 9.) Petitioner
8 raised the sole issue that Petitioner's trial attorney rendered ineffective assistance by failing to
9 request an instruction on assault. (Lodgment No. 9.) On May 26, 2005, the Court of Appeal
10 denied Petitioner's Petition for failure to show relief sought in superior court, citing appellate court
11 discretion to deny without prejudice habeas corpus petitions not first filed in a proper lower court.[2]
12 (Lodgment no. 10.)

13 On June 1, 2005, Petitioner filed a Petition for Writ of Habeas Corpus with the San Diego
14 Superior Court, again raising the sole issue that Petitioner's trial attorney rendered ineffective
15 assistance by failing to request an instruction on assault. (Lodgment No. 11.) On or about
16 September 12, 2005, in response to an Order to Show Cause, the San Diego District Attorney's
17 Office filed a Return. (Lodgment No. 12.) The San Diego Superior Court denied the Petition on
18 December 7, 2005. (Lodgment No. 13.)

19 Petitioner filed the instant Petition in this Court on November 15, 2006. (Doc. No. 1.) On
20 December 5, 2006, this Court provided Petitioner with a Notice Regarding Possible Failure to
21 Exhaust and One-Year Statute of Limitations. (Doc. No. 5.) On December 21, 2006, therefore,
22 Petitioner filed a Petition for Writ of Habeas Corpus in the California Supreme Court. (Lodgment
23 No. 14.) As in Petitioner's direct appeal, Petitioner claimed: (1) the trial court prejudicially erred
24 by not instructing the jury, *sua sponte*, on the lesser included offense of voluntary manslaughter
25 based upon unreasonable self defense; (2) Petitioner's attorney rendered ineffective assistance by
26 failing to request instruction on voluntary manslaughter and assault; and (3) there was insufficient

27

28 _____

[2] *See In re Steele* (2004) 32 Cal.4th 682, 692; Cal. Rules of Court, rule 56(b)(1).

1  evidence to support Petitioner's conviction for second degree murder.[3]  (Lodgment No. 14.)  The
2  Petition was denied without discussion on June 13, 2007.  (Lodgment No. 15.)
3      On January 26, 2007, Petitioner submitted to this Court a "Motion for Stay and Abeyance
4  to Exhaust Additional Issues in the State Supreme Court."  (Doc. No. 14.)  On September 19,
5  2007, following the California Supreme Court's denial of Petitioner's Petition for Habeas Corpus,
6  this Court denied Petitioner's "Motion for a Stay and Abeyance to Exhaust Additional Issues in
7  the State Supreme Court" as moot and ordered the District Attorney's Office to file a response.
8  (Doc. No. 17.)  The District Attorney's Office filed a Response to Petition for Writ of Habeas
9  Corpus on October 29, 2007.  (Doc. No. 19.)  Petitioner filed a Traverse on February 27, 2008.
10  (Doc. No. 22.)

## III. STATEMENT OF FACTS

Title 28, United States Code, section 2254, subsection (e)(1) provides, in relevant part: "[A] determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2245(e)(1).  The petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence.'  Id.; see also *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc) overruled on other grounds by *Lindh v. Murphy*, 521 U.S. 320 (1997) (stating that federal courts are required to "give great deference to the state court's factual findings.")  When there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state-court decision.  *Ylst v. Nunnemaker,* 501 U.S. 797, 801-06 (1991); *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9 th Cir. 2003).  The following facts are taken from the California Court of Appeal's opinion regarding Petitioner's direct appeal. (Lodgment No. 6.)[4]

A

---

[3] Petitioner's additionally claimed the trial court erred in imposing a ten-year consecutive criminal street gang enhancement under California Penal Code section 186.22(b)(1)(c), rather than the alternate criminal street gang penalty of a 15-year minimum parole eligibility term under Penal Code section 186.22(b)(5).  (Lodgment No. 14)  The California Court of Appeal agreed with Petitioner's contention and reversed the trial court's imposition of the enhancement.  (*Id.*)

[4] Petitioner's appeal was consolidated with that of co-defendant Vilath Xayasomloth for purposes of direct appeal before the California Court of Appeal.  (Lodgment No. 6.)

*The Tiny Oriental Crips Street Gang*

In 1987, Ham Xaysana (Ham), also known as "the General," started the Tiny Oriental Crips (T.O.C.), a predominantly Laotian street gang that claimed San Diego's Linda Vista neighborhood as its territory. By 2000 the San Diego Police Department's gang unit detective (Michael Gallivan) assigned to investigate Southeast Asian gangs identified 104 documented members of the T.O.C. gang. Gallivan learned from T.O.C. gang members that on occasion they carried and used weapons such as knives, handguns, rifles and machine guns. When a T.O.C. gang member was in a fight, other gang members would join the fight, even if the other side were outnumbered. Fights were not necessarily against rival gang members, but could also be against civilians. Gang fights were "all about winning," not about being fair. If a gang member did not "back up the set" by helping a fellow gang member during a fight, he would be "disrespected" by the other gang members. Gang attacks could result in death.

Ham, Prouneprasith Thirakul (Tho) and Keila were original members of the T.O.C. gang. Older members of the T.O.C. gang, including Ham, Xayasomloth and [Petitioner] Aphayavong, were known as Original Gangsters (O.G.'s). Ham's sister Khamla Xaysana (Khamla) founded the "T.O.C. Ladies."

B

*The December 2000 Party*

On December 9, 2000, beginning in the late afternoon, Ham and Khamla hosted a party at their parents' home in Linda Vista (the December 2000 party). The party was attended by approximately 20 to 40 people, many of whom were T.O.C. gang members, including Aphayavong and Xayasomloth. Aphayavong arrived at the party with his current girlfriend Thiep, a friend of Khamla. Khamla had seen Aphayavong at T.O.C. gang social events in 1994 and 2000. Khamla had last seen Xayasomloth with T.O.C. gang members at a party in 1999 or 2000.

At the December 2000 party, T.O.C. gang members wore blue clothing and

greeted each other with gang signs. Also attending the party were Khamla's friends from outside San Diego. Ultimate victim Getty arrived from Orange County with his nephew Terry Chanthachone (Jerry), Keoudone Chathavong (John) and Ketmany Keungmanivong (Ket). Arriving from Temecula shortly afterward were Tayphrasouky Phramany (Mony), Phouangmalay Douangsavanh (Lynda), Phouthasth Chounlamany (Bey) and others.

As guests from out of town arrived and entered the backyard, several individuals including Xayasomloth, looked at them up and down in a mean way ("maddogging"). Some of the maddogging individuals wore blue clothing and looked like gang members. When entering the party, Mony felt uncomfortable because he was wearing a red shirt and worried that people might think he was part of a rival gang. As Mony's girlfriend Lynda entered the party, some guests looked "weirdly" at her and made her feel she did not belong there.

During the party, Aphayavong and his former girlfriend Khonemala Didyavong (La) were arguing and cursing at each other. La's friend separated them and calmed La down. Getty also stepped in to help break up the argument.

Later, Tho, who was Xayasomloth's friend, began arguing with Tho's ex-girlfriend because she had been flirting with Getty. Eventually, the very drunk, angry and rowdy Tho began throwing bottles and chairs around the backyard. Tho challenged people to fight by motioning his hands to himself and asking, "Anybody want some of this?" Although Ham tried to calm Tho, Tho wanted to fight Ham. Ham then told the guests the party was over and asked everyone to leave. Tho continued his angry acting and cursing. Tho then asked Getty, "What's up, you got a problem?"

C

*The Killing of Getty*

After the abrupt end of the party, people began leaving the house. Mony, Bey, and Jerry saw a drunk Getty carrying a large knife when he left the party.

|   |   |
|---|---|
| 1 | Getty walked with John, Ket and Jerry around the side of the party house and |
| 2 | headed to John's parked car across the street. The guests from Temecula left at the |
| 3 | same time. Meanwhile, Aphayavong was driving his car up and down the street, |
| 4 | speeding , squealing tires and revving the engine. As Getty, John, Ket and Jerry |
| 5 | arrived at John's car, Getty was holding and playing around with a knife that had |
| 6 | been used at the party to cut meat. Jerry took the knife from Getty and threw it |
| 7 | underneath John's car.[5] |
| 8 | When John entered his car and started the engine, Xaysomloth and Tho |
| 9 | began walking quickly across the street toward John's car. Xayasomloth and Tho |
| 10 | approached Getty and Ket as they stood on the sidewalk to the right of John's car. |
| 11 | Xayasomloth asked Getty, "You got shit?" Getty said "No" and "It's cool, it's |
| 12 | cool." Getty's hands were empty. As Getty extended his hand to shake |
| 13 | Xayasomloth's hand, Xayasomloth "sucker punched" Getty in the face, knocking |
| 14 | him to the ground. |
| 15 | After Getty got up from the ground and began running away down the |
| 16 | street, Xayasomloth and Tho started chasing him. Aphayavong stopped his car in |
| 17 | the middle of the street, emerged from the car, and joined Xayasomloth and Tho in |
| 18 | the chase. Approximately five to 10 other people ran from the party house in |
| 19 | pursuit of Getty. |
| 20 | When Getty eventually fell, he was punched and kicked repeatedly by |
| 21 | people who had been chasing him. As Mony and his friends approached Getty, |
| 22 | several people who had been beating Getty began running back toward the party |
| 23 | house. Getty lay bleeding and moaning in the street when his friends arrived to |
| 24 | help. Getty had been stabbed 10 times and received several subgaleal hemorrhages |
| 25 | over his skull consistent with blunt force trauma. As Getty lay on the ground, |
| 26 | Xayasomloth continued to yell at Getty, shouting, "Get the fuck up, motherfucker, |
| 27 |   |
| 28 | [5]The knife thrown under John's car was found 170 feet from where Getty was ultimately stabbed. DNA testing did not reveal the presence of human blood on the knife. |

you want some more?" and "Fuck you, you got a problem, you want some more?"

Tho knelt down and helped Getty. Phatthana Phrakonkham (Nia) was screaming, "Take him to the hospital, take him to the hospital." While in the driveway of the party house, La heard Nia's screams and ran toward her. En route, La saw Tho and Xayasomloth. When asked by La what had happened, Xayasomloth said: "Nothing happened. Get in your car. Let's go, let's go." La then heard Nia say, "Getty got stabbed," and saw Nia on the ground with Getty. Mony and Bey put Getty into their car and drove him to the hospital.

After the attack ended, Aphayavong ran back toward the party house, got into his car that was parked in the street and told his girlfriend Thiep to get him some napkins so he could wipe off some blood. Aphayavong then drove away.

Getty died in the hospital from his stab wounds.

D

*Events After Getty's Killing*

On December 10, 2000, after midnight, Xayasomloth arrived at the home he shared with his girlfriend Janette Keovichith (Janette). After receiving a phone call from Aphayavong, Xayasomloth and Janette left their home and went to Keila's home, where they stayed for two or three days. After Xayasomloth and Janette returned home, they were visited by Aphayavong. Aphayavong told Xayasomloth that he "beat the crap" out of Getty and cut his knuckles on Getty's teeth. Aphayavong also said that he had asked his girlfriend Thiep for a napkin.

A few days after the party, Ham saw Xayasomloth at Keila's house. Xayasomloth asked Keila for the name of a good lawyer. Xayasomloth also said he needed to get the videotape of the party because it depicted the partygoers. During the conversation, Xayasomloth appeared scared and nervous. When Ham asked Xayasomloth if he had been involved in the murder, Xayasomloth did not respond.

In November 2001 after his arrest for Getty's killing, Aphayavong admitted to a sheriff's deputy that he was a member of the T.O.C. gang.

(Lodgment No. 6 at 3-8; footnote in original)

**IV. STANDARDS**

Title 28, United States Code, § 2254, sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
>
> [. . .]
>
> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(a), (d)(1)-(2).

When determining "clearly established federal law" under section 2254(d)(1), federal courts look to United States Supreme Court holdings at the time of the state court's decision. *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). Ninth Circuit law may also be considered for "its persuasive authority in applying Supreme Court law." *Van Tran v. Lindsey*, 212 F.3d 1143, 1154 (9th Cir. 2003), *overruled on other grounds*, *Lockyer*, 538 U.S. 63; *Clark v. Murphy*, 331 F.3d 1069 (9th Cir. 2003), *cert. denied*, 540 U.S. 968 (2003).

A state court's decision is "contrary to" clearly established United States Supreme Court

precedent if (1) the state court applies a rule different from the governing law set forth in Supreme Court cases, or (2) the state court confronts a set of facts that are materially indistinguishable from a Supreme Court case, but still reaches a different result. *Williams*, 529 U.S. at 405-06, 412; *Bell v. Cone*, 535 U.S. 685, 694 (2002); *Lockyer*, 538 U.S. at 73; *Clark*, 331 F.3d at 1067. It is not required that a state court decision cite to or even be aware of clearly established Supreme Court precedent, so long as neither the reasoning nor the result of the state court decision contradicts it. *Early v. Packer,* 537 U.S. 3, 8 (2002).

A state court decision may involve an "unreasonable application" of Supreme Court precedent, "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. Alternatively, an unreasonable application may be found, "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.*; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Clark* 331 F.3d at 1067. An unreasonable application of federal law requires the state court decision to be more than incorrect or erroneous. *Lockyer*, 538 U.S. at 76. Instead, the state court's application must be "objectively unreasonable." *Id.*

If the dispositive state court order does not "furnish a basis for its reasoning," however, federal habeas courts must conduct an independent review of the record to determine whether the state court unreasonably applied controlling federal law. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

## V.  DISCUSSION

### A. Insufficient Evidence to Support Conviction (Claim One)

In Claim One, Petitioner contends there was insufficient evidence to support his conviction for second degree murder. (Petition at 6, Traverse at 8-9) This claim was raised in Petitioner's

direct appeal. (Lodgment No. 3 at 35-43.) The California Court of Appeal rejected this argument, finding substantial evidence to support Petitioner's conviction for second degree murder as an aider and abettor under the natural and probable consequences doctrine. (Lodgment No. 6 at 61-67.) The Court of Appeal found evidence of Petitioner's "'presence, companionship, and conduct before and after the offense'" raised a reasonable inference the Petitioner was guilty of aiding and abetting the target offense of assault by means of force likely to produce great bodily injury. (Lodgment No. 6 at 62, *citing People v. Gonzales,* 4 Cal. App. 3d 593, 600 (1970).) Though Petitioner claims he lacked the requisite mens rea[6], the Court of Appeal noted that a showing of intent to kill is not required for conviction of murder under the natural and probable consequences doctrine. (Lodgment No. 6 at 65-66.) The Court of Appeal found it was reasonably foreseeable Petitioner's actions would cause other gang members to join the attack and result in the killing of the victim, concluding:

> [S]ubstantial evidence indicated that when Aphayavong joined [co-defendant] Xayasomloth and [T.O.C. member] Tho in chasing Getty in the presence of other gang members while Getty was trying to flee following Xayasomloth's sucker punch, it was reasonably foreseeable that other gang members would join in the chase and assault Getty via a rat-pack takedown that would lead to his fatal stabbing. Based on that evidence, the jury reasonably determined Getty's killing was the natural and probable consequence of Aphayavong's aiding and abetting the target crime. Accordingly, Aphayavong's conviction for second degree murder as an aider and abettor under the natural and probable consequences doctrine was amply supported by the evidentiary record.

(Lodgment No. 6 at 67.)

Clearly established federal law provides the Due Process Clause is violated, and an applicant is entitled to habeas corpus relief, "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt" of

---

[6] Mens rea is defined as "[t]he state of mind that the prosecution, to secure a conviction, must prove that a defendant had when committing a crime." BLACK'S LAW DICTIONARY (8th ed. 2004).

1  every element of the offense.  *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *In re Winship*, 397
2  U.S. 358, 364 (1970) (holding that the Due Process Clause requires proof beyond a reasonable
3  doubt of every fact necessary to constitute the crime being charged).  Under *Jackson*, a reviewing
4  court examines the evidence in the light most favorable to the prosecution and asks whether "any
5  rational trier of fact could have found the essential elements of the crime beyond a reasonable
6  doubt."  443 U.S. at 319.  Federal habeas courts must respect the province of the trier of fact to
7  determine the credibility of witnesses and resolve conflicts in the evidence. *Id.*  "All reasonable
8  inferences from the evidence must be drawn favorably to the Government as the prevailing party."
9  *United States v. Winn*, 577 F.2d 86, 91 (9th Cir. 1978).

10  When reviewing a claim of insufficient evidence, federal habeas courts must analyze
11  habeas claims challenging state convictions "with explicit reference to the substantive elements of
12  the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n. 16.  Since there is no
13  reasoned decision from the California Supreme Court on this ground, this Court must "look
14  through" to the last reasoned state court opinion as a basis for the analysis.  *Ylst*, 501 U.S. at 806.
15  As noted above, in the instant case the California Court of Appeal addressed the sufficiency of the
16  evidence in Petitioner's direct appeal and found there was sufficient evidence to support a
17  conviction of second degree murder as an aider and abettor under the natural and probable
18  consequences doctrine.  (Lodgment No. 6 at 61-67.)  This Court must therefore determine whether
19  the state appellate court opinion "reflected an 'unreasonable application of' *Jackson* and *Winship*
20  to the facts of this case." *Juan H. v. Allen,* 408 F.3d 1262, 1275 (9th Cir. 2005).

21  In California, a person aids and abets the commission of a crime when "he or she, (i) with
22  knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of
23  committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids,
24  promotes, encourages or instigates the commission of the crime." (Lodgment No. 6 at 22, *citing*
25  *People v. Cooper*, 53 Cal.3d 1158, 1164 (1991); *People v. Beeman*, 35 Cal.3d 547, 561 (1984).)
26  "The logical basis for conviction of an aider and abettor is that with knowledge of the
27  unlawfulness of the act, one renders some independent contribution to the commission of the crime
28  or otherwise makes it more probable that the crime will be successfully completed than would [be]

the case absent such participation." (Lodgment No. 6 at 22-23, *People v. Brady* 190 Cal. App. 3d 124, 132 (1987).) "The presence of one at the commission of a felony by another is evidence to be considered in determining whether or not he was guilty of aiding and abetting; and it has also been held that presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred." (*People v. Moore* 120 Cal. App. 2d 303, 306 (1953), *citing Gonzales* 4 Cal. App. 3d at 600, *disapproved on another point in People v. Alvarez* 14 Cal. 4th 155, 219, fn. 23 (1996).) It is not required that the crime aided and abetted be the original intent of the perpetrator. *Beeman*, 35 Cal.3d at 559-60. A person "who knowingly aids and abets criminal conduct is guilty of not only the intended crime but also of any other crime the perpetrator actually commits that is a natural and probable consequence of the intended crime. The inquiry is not whether the aider and abettor actually foresaw the additional crime, but whether, judged objectively, the occurrence of the additional crime was reasonably foreseeable." *People v. Mendoza* 18 Cal.4th 1114, 1133 (1998).

Contrary to Petitioner's assertion that his conviction was based entirely on opinion testimony given by a prosecutorial expert, the Court of Appeal noted other evidence supporting the conclusions of the expert, such as Petitioner's presence at the party on the night of the incident, and Petitioner's behavior on the night of the incident, including stopping his car in the middle of the street to chase the fleeing victim. (Lodgment No. 6 at 62-63.) In fact, Petitioner admitted to being a T.O.C. gang member after his arrest in 2001. (*Id.* at 8.) The Court of Appeal concluded that the Petitioner's *actus reus*[7] - "(1) aggressively driving wildly up and down the street as T.O.C. gang members were leaving the December 2000 party; (2) stopping and parking his car in the middle of the street after Getty began running away following Xayasomloth's sucker punch; (3) joining Xayasomloth, Tho and other gang members in chasing Getty down; and (4) beating the 'crap' out of Getty - contributed to other gang members joining the chase, the beating and the stabbing that ensued." (*Id.* at 64-65.) The Court of Appeal noted evidence indicating "that when a T.O.C. gang member became involved in a fight, other gang members would join the fight even

---

[7]*Actus reus* is defined as "[t]he wrongful deed that comprises the physical components of a crime and that generally must be coupled with mens rea to establish criminal liability." BLACK'S LAW DICTIONARY (8th ed. 2004).

1  where, as here, the other side was outnumbered, with the exception that O.G.'s were not
2  necessarily required to fight in a gang altercation. (*Id*. at 66.) A gang member who did not back
3  up the set by aiding his fellow gang member during a fight would be disrespected by other gang
4  members. . . . Gang members were known to carry and use weapons on occasion." (*Id*.)

5  Petitioner has not demonstrated the state appellate court's decision was an objectively
6  unreasonable application of *Jackson*. Although Petitioner claims there was insufficient evidence
7  supporting his conviction of second degree murder as an aider and abettor under the natural and
8  probable consequences doctrine, the record suggests otherwise. The California Court of Appeal's
9  determination that there was sufficient evidence to support Petitioner's conviction was not
10 contrary to, nor an unreasonable application of, the standard enunciated in *Jackson*. The evidence
11 presented at trial could rationally support a finding Petitioner was guilty beyond a reasonable
12 doubt of second degree murder as an aider and abettor under the natural and probable
13 consequences doctrine. Accordingly, this Court recommends **DENYING** habeas relief as to
14 Petitioner's claim based on insufficient evidence.

15 **B.** **Receipt of Ineffective Counsel (Claim Two)**

16 Petitioner claims he received ineffective assistance of counsel in violation of the Sixth
17 Amendment because his attorney failed to request an instruction on the lesser included offense of
18 voluntary manslaughter. (Petition at 7, Traverse at 10-11.) This Claim was raised in Petitioner's
19 direct appeal. (Lodgment No. 3 at 28-34.) Petitioner contends the failure of his trial attorney to
20 request an instruction on lesser included or related offenses was prejudicial because it prevented
21 the jury from considering a lesser charge on the theory that the stabbing of the victim was not the
22 natural and probable consequence of Petitioner's actions. (Petition at 7, Traverse at 10.)

23 The right to effective assistance of counsel, as guaranteed by the Sixth Amendment, is
24 denied when "a defense attorney's performance falls below an objective standard of
25 reasonableness and thereby prejudices the defense." *Yarbrough v. Gentry*, 540 U.S. 1, 4 (2003),
26 *citing Wiggins*, 539 U.S. at 521, *Strickland v. Washington*, 466 U.S. 687. In circumstances where
27 a state court has already considered and rejected an ineffective assistance claim, a federal court
28 shall not grant habeas relief unless the state court decision rejecting the claim "resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1). The Supreme Court has held that claims of ineffective assistance of counsel are "mixed questions of law and fact" that should not receive deference to the full extent of section 2254(d)(1). *Strickland*, 466 U.S. 698. However, even in such cases where this Court is presented with a state court rejection of an ineffective-assistance claim, a petitioner is required to overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Bell*, 535 U.S. at 698, *quoting Michel v. Louisiana*, 350 U.S. 91, 101 (1955).

In order to establish ineffective assistance of counsel, Petitioner must show both incompetence and prejudice. *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *Strickland*, 466 U.S. 698. Unless Petitioner "makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. *Strickland*, 466 U.S. 687. The standard governing competence set forth in *Strickland v. Washington* requires Petitioner to show "counsel's representation fell below an objective standard or reasonableness." *Id.* at 688. "Judicial scrutiny of a counsel's performance must be highly deferential." *Id.* at 689. Therefore, a strong presumption must be maintained that counsel's performance falls within "the wide range of reasonable professional assistance." *Id.*

However, even if it can be shown counsel has provided assistance that falls below the allowable standard of reasonableness, a showing of prejudice is required to establish a violation of the Sixth Amendment. *Id.* "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The defendant must show with reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694. A "reasonable probability" is defined as a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.*

As noted above, the Court of Appeal rejected Petitioner's prior claim of ineffective counsel. (Lodgment No. 6 at 71-76.) The Court of Appeal recounted the trial court proceedings as

follows:

> After discussing jury instructions with counsel, the trial court stated it would not instruct that voluntary manslaughter was a lesser offense included in the charged crime of murder since the state of the evidence and reasonable inferences indicated there was no basis upon which Aphayavong could be convicted on that lesser offense, an assessment with which defense counsel concurred. Defense counsel also stated that even if the jury could possibly find Aphayavong guilty on voluntary manslaughter as a lesser included offense, counsel as a matter of trial tactics wanted the court not to instruct on that offense.

(Lodgment No. 6 at 71.)

While the record fails to indicate precisely why Petitioner's trial counsel opted not to request an instruction regarding the lesser-included offense of voluntary manslaughter, the Petitioner bears the burden of showing his trial counsel's assistance fell below an objective standard of reasonableness. *People v. Pope* 23 Cal.3d 412, 425 (1979), disapproved on another point in *People v. Berryman* 6 Cal.4th 1048, 1081, fn. 10 (1993). Given the lack of indication in the record regarding trial counsel's motives, Petitioner is unable to overcome the presumption that trial counsel's decision not to request an instruction on the lesser included offense of voluntary manslaughter was sound trial strategy. It would be reasonable to infer, in fact, that trial counsel may have wagered that the inclusion of such an instruction would have ensured a conviction of some kind. Alternatively, without an instruction on a lesser included offense the jury may have been hesitant to convict the Petitioner of second degree murder and would have preferred to acquit. Therefore, this Court recommends **DENYING** habeas relief as to Petitioner's claim based on ineffective assistance of counsel.

## C. **Trial Court Error in Jury Instruction (Claim Three)**

Petitioner claims the trial court prejudicially erred by failing to instruct the jury, *sua sponte*, on the lesser included offense of voluntary manslaughter or on the lesser related offense of assault, based on a theory of imperfect self-defense. (Petition at 8, Traverse at 11.) This Claim was addressed by the California Court of Appeal on direct appeal and presented to the state

supreme court in a habeas petition.  (Lodgment Nos. 3, 14.)

      i.      <u>Lesser Included Offense - Voluntary Manslaughter</u>

With regard to the lesser included offense of voluntary manslaughter, the Court of Appeal rejected Petitioner's Claim on direct appeal.  The Court held that in order for Petitioner to seek conviction for voluntary manslaughter based on unreasonable or imperfect self-defense, Petitioner would be required to show that the perpetrator who stabbed the victim acted in "an unreasonable but good faith belief in the need to act in self defense" or otherwise "*actually* but unreasonably believed he was in *imminent* danger of death or great bodily injury."  (Lodgment No. 6 at 69, *quoting People v. Robertson*, 34 Cal.4th 156, 164-165 (2004); *People v. Barton*, 12 Cal. 4th 186, 199, 201 (1995); and *In re Christian S.*, 7 Cal.4th 768, 783 (1994), emphasis added in Court of Appeal opinion.)  However, the Court of Appeal found:

> [T]here was no evidence to support Aphayavong's theory that the perpetrator actually had a good faith belief that he (the perpetrator) was in imminent danger of death or great bodily injury when Xayasomloth sucker punched Getty, when Xayasomloth joined in the chase of Getty in the presence of other gang members, or when Getty was fatally stabbed.  Further, an inference of the existence of any such actual good faith belief at any of those times would be speculation.

Lodgment No. 6 at 69, *citing Robertson*, 34 Cal. 4th at 164-165, *Barton*, Cal. 4th at 199, 201. The Court of Appeal concluded such speculation would be "an insufficient basis upon which to require the trial judge to give a lesser included offense instruction." (Lodgment No. 6 at 69, *citing People v. Wilson*, 3 Cal. 4th 926, 942 (1992).)

The constitutional right to have the jury instructed on a lesser-included offense in certain instances was extended to capital murder defendants in 1980.  *See Beck v. Alabama*, 447 U.S. 625 (1980). Since that time the Ninth Circuit in *Bashor v. Risley* has held "the failure of a state court to instruct on a lesser offense [in a non-capital case] fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding."  730 F.2d 1228 (9th Cir. 1984), *quoting James v. Reese*, 546 F.2d 325, 327 (9th Cir. 1976).  The *Bashor* court stated that there may be exceptions to this general statement "because the criminal defendant is also

1  entitled to adequate instructions on his or her theory of defense." 730 F.2d 1240.  This Court,
2  however, is barred from creating such a rule, as habeas corpus "cannot be used as a vehicle to
3  create new constitutional rules of criminal procedure." *Teague v. Lane*, 489 U.S. 288, 316 (1989).
4  Even if such an exception were recognized, the California Court of Appeal, as noted above, found
5  no error in the trial court's failure to instruct on the lesser included offense of voluntary
6  manslaughter because there was not substantial evidence to support such a charge. (Lodgment No.
7  6 at 71-77.)  In addition, the California Court of Appeal noted, "even if such instruction were
8  supported by the evidence, 'the doctrine of invited error'[8] would bar Aphayavong 'from
9  challenging on appeal the trial court's failure to give the instruction.'" (Lodgment No. 6 at 70,
10 quoting *Barton*, 12 Cal.4th at 198.)  Therefore, this Court may not address this claim as habeas
11 relief is not available.  *Carey v. Musladin*, 127 S.Ct. 649, 652-654 (2006).

12       ii.     <u>Lesser Related Offense - Assault</u>

13 Furthermore, the trial court had no obligation to instruct the jury on the lesser related
14 offense of assault.  The trial court may instruct on a lesser related offense when requested by
15 defendant and with the prosecution's consent.  However, as noted by the Superior Court:

16     [The district attorney]'s declaration quite clearly establishes that the
17     prosecutor would not have concurred in a request for an instruction on the lesser
18     related offense of assault. [Aphayavong] argues that despite [the prosecutor]'s
19     declaration, he may have agreed to such an instruction in the interests of justice,
20     especially with the court's urging, had his trial attorney acted competently.
21     However, this assertion is based on nothing more than speculation and is belied by
22     [the prosecutor]'s express statements to the contrary.
23     Therefore, even if [Aphayavong]'s counsel would have requested the
24     instruction, the evidence is clear that [the prosecutor] would not have concurred in

---

[8]Under the doctrine of invited error, a party whose conduct induces or invites the commission of error by the trial court is estopped from asserting the error as a ground for reversal on appeal. *See Jackson v. Superior Court*, 10 Cal. 2d 350 (1937); *Pobor v. Western Pac. R. Co.*, 55 Cal. 2d 314 (1961); *Norgart v. Upjohn Co.*, 21 Cal 4th 383 (1999); *Telles Transport, Inc. v. W.C.A.B.*, 92 Cal. App. 4th 1159 (5th Dist. 2001); *Geffcken v. D'Andrea*, 137 Cal. App. 4th 1298 (2nd Dist. 2006); *R & B Auto Center, Inc. v. Farmers Group, Inc*., 140 Cal. App. 4th 327 (4th Dist. 2006).

|   |   |
|---|---|
| 1 | such a request, and the trial court, in turn, would not have been permitted to give |
| 2 | the instruction.  Thus, [Aphayavong] cannot establish that he suffered any prejudice |
| 3 | from this error, since he is unable to establish the result would have been different |
| 4 | if his trial counsel had requested the assault instruction. |
| 5 | One fails to state a prima facie case when he cannot demonstrate any |
| 6 | prejudice resulting from counsel's alleged errors or omissions.  ([*Strickland*, 466 |
| 7 | U.S. 668, 687].)  Further, as the Strickland court advised, "a court need not |
| 8 | determine whether counsel's performance was deficient before examining the |
| 9 | prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is |
| 10 | easier to dispose of an ineffectiveness claim on the ground of lack of sufficient |
| 11 | prejudice, which we expect will often be so, that course should be followed." |
| 12 | ([*Strickland*, 466 U.S. at 697].)  As set forth above, Aphayavong has failed to meet |
| 13 | his burden to affirmatively prove that any prejudice resulted from trial counsel's |
| 14 | alleged error. |

15 Lodgment No. 13 at 4-5.

16 Petitioner does not have an established constitutional right to receive an instruction on the
17 lesser included offense of voluntary manslaughter or the lesser related offense of assault.
18 Therefore, Petitioner fails to state a federal question and this Court recommends **DENYING**
19 habeas relief as to Petitioner's claim based on trial court instructional error.

20

21 **VI. CONCLUSION AND RECOMMENDATIONS**

22 For all the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an
23 Order: (1) approving and adopting this Report and Recommendation, and (2) directing that
24 Judgment be entered denying this Petition.

25 **IT IS ORDERED** that no later than **April 18, 2008**, any party to this action may file
26 written objections with the Court and serve a copy on all parties.  The document should be
27 captioned "Objections to Report and Recommendation."

28 **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court

1 and served on all parties no later than **May 2, 2008**. The parties are hereby advised that failure to
2 file objections within the specified time period may result in a waiver of those objections on
3 appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Ylst*, 951
4 F.2d at 1156.

6 DATED: March 16, 2008

*[signature]*

Hon. William McCurine, Jr.
U.S. Magistrate Judge
United States District Court